Page number 25, page 57-59. John Norman v. Joseph Horton et al. Well, he is not here. Page number 25, Andrew Sparks v. Desmond LaDuke. Thank you. Good morning, Your Honors. Andrew Sparks along with Jonathan Fannin here for the appellate of the estate of Desmond LaDuke. I'd like to reserve three minutes. Great. Very good. Desmond LaDuke was killed on October 22, 2022. He was shot by Joseph Horton, operated under the orders of Jason Firdozio. The question before the court is whether this was error for the district court to grant summary judgment on behalf of the defendants. The court's decision was error for two primary reasons. First, the defendant's show of force was excessive, which violated Desmond LaDuke's constitutional rights. Could I stop you right there so we can keep these separate? It seems to me we have a lot of cases that say that you can point a gun at somebody under the proper circumstances. So it seems like you've got a hard argument to make in light of those cases unless you can really distinguish them. Yes, sir, and what I would answer with is this, with the distinction between the excessive show of force and the excessive use of force. I'm talking about show of force, pointing your gun. Yes, sir, and so I think what has to happen here is the totality of the circumstances. So if you look at the timeline, which I think is critical in this case, there is a call to police to do a welfare check that Desmond LaDuke is suicidal based upon breaking up with his girlfriend. They show up at 1030. At 1030, Desmond does not have a weapon in his hands. It's undisputed that they knew he had a gun. They knew he had a gun. Yes, that is correct, Your Honor. But when they show up at his door at 1030 a.m., he answers the door. The police come and they know you have a gun. You're saying they can't point their gun at that person unless they actually see the gun. Well, I'm not saying that, but they didn't point their gun at that point in the encounter. So at 1030, they come and they knock on the door. Desmond is in his house with his girlfriend, Ms. Marksberry. At that point, the police ask if she can leave, and he allows her to leave. He also tosses out her cell phone. At that point, the police had not displayed a weapon on Desmond, and Desmond had not pulled out or shown to the police that he actually had a gun in his possession. What happens next is the police decide to contact their commanding officer who dispatches SRT, Special Response Team. This happens at a special response team gets notified at 1103. At that point, the commander says that all the responders are to respond to a scene of a barricaded suspect. That's the first of a series of tragic errors here. He was not a barricaded suspect. He was a young man in an acute suicidal condition, but he had not committed any crime at that point. It takes over half an hour for the SRT to respond. At that point, they come in, and during this—actually, it takes over 50 minutes. During this 50 minutes, nothing escalates. Desmond does not go out. He is not seen brandishing a weapon. He is not firing a weapon. He is not threatening anybody. I'm cognizant of your time here and that I got you down this road by asking the question. So just tell us, when did it turn into an unconstitutional show of force? When the six SRT members showed up in full tactical gear with their assault rifles pointing at him. That's when it showed up. That's when they began an excessive show of force. Now, he's in the house, and you say it was pointing these guns at him. They were pointing at the house. There's no question about that. But he wouldn't come out of the house. And when did he even see these guns until he went to the back, to the window in the back of the house, where he had a gun in his hand? Well, he saw it before then. He saw it before then. There's a couple of different scenarios. One, he's talking to his aunt, saying, the police are not here to help me. They're here to shoot me. That's why they have all the guns. Then he goes to the back of the house, opens the blinds. Officer Horton is set up on the tree line with a rifle, and that's ultimately where the shot was fired from. But to answer your question, yes, they were pointing the guns at the house, but they were pointing it at Desmond inside the house. The question was, we have a lot of cases that say, if you're a police officer, you can point a gun at a person who you believe has a gun. So all I'm asking is, how do you distinguish those cases? Yes, sir. And how I distinguish those cases, I think those were very important because of what was happening here. This was not a situation where there was a barricaded suspect, or a situation that was in public, or a situation in which an individual had been making threats to anybody. He was in his home, and you mentioned he didn't come out, but he was under- To answer my question, you have to say, well, all of those cases involve X, and this case involves Y. That's all I'm asking. Yes, sir. And I don't mean to take up all of your time. Apologies. This case involves, the reason why he was suicidal when he was not a threat to anybody else or to the public, that's why it was, instead of treating him as a suicidal individual, they treated him as a suspect who had already committed a crime. But what case clearly establishes the law for the police that they couldn't do it? I mean, not only do you have to distinguish the cases, you have to show us what clearly established the law. Judge, I think there are a number of cases that clearly establish. I rely upon the Heater case, which we cite in our briefs. We also cite on pages 6 and page 8 through 10 of the reply a number of cases which say, stand for the proposition of- But those cases are Heater's, the actual use of force, isn't it? Not the show of force. I mean, I'm talking about the show of force. That's, I mean, if you want to talk about the use of force, we can get to that. Well, I do, but I want to respond to your question, which is the actual use of force. And again, the issue here, you know, there is not a case that I was able to find in which six armed members of police came up with assault rifles pointing at somebody. But I believe that the case law is also that an objectively reasonable individual would know not to do this. And in this situation, when you have somebody who is suicidal and not a threat to anybody else, showing up and pointing guns at them, of course agitated them. And it was in direct violation of the Nicholasville Police Department's policy. Just give us, to answer that question, just give us your best case that the law was clearly established. Is Heater your best case? Heater is the best case, Your Honor. Thank you. Yes, but I would rely upon the other cases we cite because we do cite a string of cases for that. At the time the guns were pointed, had your client appeared at the window displaying his firearm at that point such that the officers could see that he had a gun in hand? After the SRT team responds is when they saw him. And there's numerous factual disputes as to what they actually saw. Some of them believe he had two weapons. Some of them believe he had one. He was pointing at his head. He was not. But that happened at an approximate... No doubt, no matter which version you believe, he had a gun. Absolutely, he had a gun. No dispute about that. No, sir. Right? No, sir. Okay. Yes, but he was not brandishing the gun when the police showed up and pointed six assault rifles at him. He was not. And I don't believe there's any dispute about that. Moving on to the segment to the use of force, and what we believe is the second error is the actual shooting of Desmond, is this. And we believe the district court committed error in looking at the moment that was shot, not under the totality of the circumstances. And the district court has a footnote where it references that the Barnes v. Felix case occurred the day before the opinion was issued, requiring a totality of the circumstances. But the court's analysis didn't do that. The court's analysis focused on the moment when Desmond was pointing the gun at his head, and then what they say is leveling the gun. And so what we have here is a situation where the police created the environment in which they used to justify shooting Desmond. And so they come around and they have a young man who's in acute emotional distress. Instead of trying to de-escalate the situation, they do everything they can to escalate the situation, yelling at him. Within minutes of getting there, Officer Fadasio said, boys, I think today is the day it's going to happen. Desmond had three or four times raised and lowered his gun, to which Officer Fadasio tells Officer Horton, if he does that again, you have to shoot him. And again, the totality of the circumstances are important here, and this is what the district court ignored. The court's focus was simply on leveling the gun, and at that moment, the officer perceived himself to be in danger. But that doesn't take into account the creation of the circumstances, that the individual committed no crime. Let's go back to where we were before. What is your best case that you say establishes the law that you can't shoot a mentally ill person who's wielding a gun and taunting the officers with a gun? What case should the police have relied upon? Judge, I would rely on the Heeder case, which also involved a mentally ill person. I would also rely upon – I want to give the citations here, just one second. The person in the Heeder case did not have the gun in hand. The gun was on the table, and there was disputed testimony as to whether the individual was moving toward the gun or not. That is correct, but it was a suicidal person. And so I believe in that situation, there was a suicidal person they were focusing on, and the police shot him. One thing that I think is also important – and the court said they couldn't – is blatantly, at the time that they shot him. The court said you can't do that. How do you match the facts of that case with this case? Well, I think a couple of points. And one thing the court also pointed out in Heeder was that other officers didn't respond by firing. Here we had six officers that were surrounded, only one of which apparently perceived himself to be in danger and fired. That was a point that was made in Heeder. So I think that is an important issue. But that would be extraordinary for us to say that, that for the police to claim qualified immunity, they all have to shoot somebody. Is that really what you want us to say the law is? No, Your Honor, and that's not the point I was making. The point I was making was the reasonableness of the expectation that he was actually in danger, that he actually believed that the use of force was appropriate at the time in which he shot Jasmine in the chest. And so getting back to – Can I ask you a quick question about Monell? Yes, sir. You have complained in this case that the district court dismissed the Monell claim because they had found there was no constitutional violation. So I want to assume, for the purpose of my question, there was a constitutional violation here. And then we're looking at clearly established. We've talked about whether there is any case that would qualify for clearly established. But if there isn't, would you concede that your Monell claim fails as well? In other words, you can't be deliberately indifferent if there isn't a case that prohibits that conduct. Failing that, the Monell claim fails. Judge, I would not because I think that you also look at whether or not it is clear under – even if there is not a case directly on point, whether or not a reasonable person in that situation would know it was improper. And in this situation, we – But Monell doesn't address whether a reasonable person would know it was improper. That's pretty close to responding on superior liability. We're talking about whether there was a policy, practice, customer procedure here that led to the alleged constitutional violation. Yes, and our position with that – And you say there can be, even if the law is not clearly established. Yes, because – That's what you're saying, right? Yes. So what case do you rely upon for this narrow proposition that the law doesn't have to be clearly established in order for there to be a Monell claim? Judge, I don't have a case on point for that position. But the position is here on the Monell claim – Okay, so you answered my question. One other question, then I'll quit. Assuming there was such a case, you then have to go on and – Paused by the municipality. Policy, practice, customer procedure. You don't say anything about that, the second prong of a Monell claim. From what I can see, there isn't any evidence that they didn't receive training or that there was a policy or a custom other than your bare allegation of the complaint. So where do I look in the record to find the factual basis for the second prong of your Monell claim? Judge, those are found in the depositions, and I can give you citations to that. But the larger issue is this. Okay, so you want us to look at the depositions. Of whom? Of all of the police? Of the police, but primarily Horton, Frodasio, and what I would – That's all. Sorry. Time is up. So I should look at Frodasio's deposition. That will provide the basis, the factual basis, for your Monell claim. Yes, if I can, what I would say is that in the depositions, what you consistently see is that a lack of training on behalf of these individuals. That's what you will consistently see, that they were not properly trained to respond to suicidal individuals such as this. They responded to him as if he was a criminal committing an act of crime rather than an individual who was in an acute suicidal position. Thank you. What do you see about the officer's testimony that he actually pointed the gun at them in addition to pointing it at himself when he appeared in the window of the house? A couple of things, Your Honor. First, we believe the district court error is just considered the moment that that happened, not the totality of the circumstances. And why that was an error is a couple of reasons. First of all, when asked why he believed it was – why he believed he needed to shoot, he originally said, well, I perceived myself in danger. Then he said, well, it was the other individuals that were in danger. But that's just not supported by the record. The other individuals behind him who would have been potentially in the line of sight of the firearm were Officer Marshall, who was actually behind the building attempting to call Desmond at that time, so he was in no danger, and then Firdazio, who was lying prone on the ground. And so leveling, lowering was not pointing at anybody else. In this case, Officer Horton had significant confusion about what was happening here. And so – and then to the second point, he had raised and lowered his hand three to four times. At no point had he told him anybody he was going to shoot. At no point had the police told him, we're going to shoot you if you do that again. And at no point did he actually aim the gun. There is a – he's leveling, he's lowering it, but there's no aiming. So that is the response to that question, Your Honor. What's the difference if you level it in the general direction of the officer versus aiming? You seem to be drawing a distinction. I am, Your Honor, and I think this is the distinction. What was happening here, again, was an individual in an acute crisis. We've read the facts. We get that. Just tell me the difference between leveling and aiming. Lowering or leveling a gun is different from pointing with an intent to shoot. Leveling or lowering – I can't possibly say that the police are supposed to define whether the police actually intends to fire the gun. The cases seem to me, at least, to be very clear that if you point a gun in the general direction of the police after having been told to drop the weapon, that you're going to get shot. Am I right about that? Judge, you are right about that. So that's what the cases say, right? Yes, case law does say that. But again, and I don't mean to repeat myself, you have to look at the totality of the circumstances, which is this. He had done that at least three times prior without shooting anybody. He had never threatened to shoot the police. Because he hadn't shot the first two or three times, then the police are no longer in sufficient danger to shoot him. That's basically what you're saying. I am saying that, but I'm saying that with a nuance, Judge, and I think that nuance is important. If that's what you're saying. Judge, there was a case – I'll give you the citation. It just came out a couple weeks ago in Canton about an individual who was shooting firework – who was shooting off a weapon on New Year's Eve. And that case also talks about improper to shoot a person who was – when the police officer was lowering the weapon. Is that in your briefs? That is not. That came out, I believe, in March. I think it was March 26th. That was just a recent case that came out in the Sixth Circuit. The case clearly does not establish clearly established law for purposes of police actions in this case, because it was years after. That's very true, Your Honor. Did you have one that's near or before – Near or before the shooting happened that that was an individual pointing a gun at the police? Well, that supports your proposition that if they wave the gun around a couple different times, then they get a pass for waving it around the next time, when the law seems to be clearly established that if you wave a gun at a police officer, regardless of whether it's the first, second, third, or fourth time, you're going to be shot. Judge, I don't have a case on – You agreed with me a moment ago. That's what the case is saying. I agree with you that the case – the cases say that if the officer perceives himself to be in an immediate threat, risk of being shot, they don't have to wait for the police – for the individual to actually shoot with them. I absolutely agree with that. But that's not what happened in this case. Again, what happened in this case is an individual who was raising and lowering a gun at his own head. He was a danger to himself, not to the officers. And that is critical, and that is the critical distinction. And even when there's not a direct case on point, there are a number of cases that we cite in the brief that say just because you have a firearm doesn't mean – or another weapon – doesn't mean that the police get to shoot you. There has to be a firearm plus something else, plus an intent. And there is no stated intent by Desmond the Duke to hurt the police. All he was doing was threatening himself. And the police come and the – I do not have a case that says stated intent, Your Honor. But, again, I believe the larger point is that even when there's not a case directly on point in which you have an individual who's surrounded by an assault team, essentially, that the police still must be in a position where if it is reasonable to – it has to be reasonable to shoot the individual. And, again, in this situation where you have an individual who's suicidal and pointing the gun at his head and threatening himself, the police shouldn't go ahead and shoot him. And that is the point of – that is the argument that we're making, Your Honor. You're out of time, aren't you? Yes, sir. I apologize. I'm well out of time. All right. You're from the other side. Thank you. Good morning, Your Honors, opposing counsel. My name is Tyler Chelf. This is my co-counsel, Scott Miller. We're here on behalf of Defendant Appellees Officer Joseph Horton and Lieutenant Jason Ferdosio. This case is an unquestionably tragic encounter and a difficult situation. And it's not lost on me or either of the officers the gravity of what happened here. But Your Honor made a good point that Mr. LeDuc would not come out of the house during this incident. The officers knew that he had a gun when they responded, and they had to balance trying to get Mr. LeDuc the help that he needed but also the safety of the community. This unfolded in a duplex in a neighborhood on an October Saturday morning when residents were in their homes requiring the police to begin evacuating nearby residents. A crowd formed across the street. Mr. LeDuc's girlfriend was inside the house and immediately came out emotionally, told the officers he had a gun, he threatened to kill himself. When I tried to take the gun... Did they have any indication that he posed any danger to anybody other than himself? I mean, when your friend on the other side says, look, they come with... I mean, they're the ones that escalate right away. They have their guns out, they're pointed at the house. Nobody's suggesting that he's going to do anything other than maybe kill himself. Why was that the response? Well, the response was that way because when the initial officers tried to talk with him, tried to get him to come out of the house, he refused to do so. They knew he was armed with a weapon. They knew he was making statements that he intended to use that weapon, which created a danger not only to himself but others in the area. He was in a duplex, there's multiple people around, his girlfriend's there, and you have the officers there as well. So the officers are trying to balance not only getting him the help he needs, which they were required to under the law, KRS 202A.041, required them once they had information that he was mentally ill and a danger to himself or others, they were required, they shall take him into custody and transport him to a hospital to receive treatment. And so with that information and with the fact that he would not come out of the house and talk to them, that would have ended the encounter right there. They called in the special response team in order to contain that threat and protect the public from the threat while also being able to negotiate with him. The officers attempted multiple times throughout the encounter via phone calls, text messages, to reach him, to talk to him. When those didn't work, they had a family member on scene, his aunt, who they called and connected with him and tried to negotiate with him multiple times. Throughout the entire encounter, he made threats, there's a 95% chance that I'm going to die today or the police are going to die. No one's coming in, no one's coming out. All while the officers continued to say, please just come out. Something more than that. Correct, and I would submit the police did not shoot him because of the threat that he was going to kill himself. Officer Horton shot him because he pointed a weapon at Officer Horton and the other officers that were in his area, which were Captain Marshall and Lieutenant Ferdosio. He was clear in his testimony that I perceived a threat to myself and I perceived a threat to the other officers in the area, which the imminent deadly threat of an officer having a gun pointed at them has been consistently held, but that is probable cause of perception of an imminent deadly threat. He refused to drop the weapon no less than 25 times throughout this encounter as they continually requested that he drop the weapon and come outside. Nobody's here to hurt you. They continually said that. You know, we do have some cases that say that police can't shoot someone even if they're in possession of a firearm, if they're not pointing or assaulting or being threatening with a firearm. You can't simply shoot someone because they do have a firearm and the testimony from the officers seemed to be somewhat conflicted as to whether he was pointing the gun at the officers. One of the officers, I think it was Officer Michael, said that he did not see the man point the gun at the officers. Doesn't that create a little bit of a factual dispute, a material factual dispute that maybe should be resolved by a jury instead of by the court? Isn't it a little bit of an open question as to whether he pointed the gun, he actually pointed the gun at the officers? I would submit that it's not, Your Honor, that the undisputed facts of the officers that could see him at the time in the record, Officer Baltrip, Lieutenant Firdosio, and Officer Horton all testified that they observed him point the weapon at the officers in the direction of Horton, Marshall, and Firdosio. So you're saying that Marshall didn't see him at the time that he got shot? That's correct. Because Marshall does say he doesn't recall him pointing the gun at anybody, but Marshall was making a phone, trying to contact him, is that right? That's absolutely right. Captain Marshall was in the area of Lieutenant Firdosio and Officer Horton, and Captain Marshall was the crisis negotiate team leader. He was trying to call and text and get a hold of Mr. LeDuc, and he testified he peered around the corner of the house. He went out from cover and made a calculated risk, putting himself in danger. He knew the risk he was putting himself in danger, but that was to try to show Mr. LeDuc, please answer your phone. I'm trying to call you. They were trying to talk to him, trying to get him to come out of the residence to end this, and Captain Marshall had came back around the corner when the shot was ultimately fired, and he did not see. But the officers that did see Mr. LeDuc at that time all testified that he was pointing the gun in the direction of the officers. But didn't Marshall also testify he was surprised that Horton shot him, right? He testified. I wasn't expecting that, which suggests to me that nothing had been going on that would have warranted him getting shot. Well, I would submit that Officer Horton perceived that threat, and the district court noted during that last five minutes when Mr. LeDuc appeared in the window, his actions became even more and the most threatening in the final seconds, and Horton's inaction in the final minutes leading up to that corroborates that in that final moment he saw something more threatening that was more of an immediate danger to those officers, which is why he fired his weapon. And so... Correct. Captain Marshall did not observe him at the time that the shot was fired. Correct. But Officer Horton did, Lieutenant Ferdosio did, and so did Officer Baltrip. And Your Honor made a good point that not every officer has to observe, has to fire their weapon in order for there to be qualified immunity in this case. Qualified immunity is intended to give a built-in measure of deference for an officer's on-the-spot judgments. It protects sometimes the hazy border between acceptable and unacceptable use of force. In this case, the officers were anything but incompetent. Qualified immunity protects all but the plainly incompetent and those that knowingly violated the law. And here, as the district court found, the use of force was not a constitutional violation, but even if it was, even if the court were to find that it was, it doesn't fit into clearly established rights that appellant wishes this case to fit into. The Heeter case... I have a question about the clearly established... Actually, can I ask you a question about the Monell Claim then? If the law isn't clearly established for either show of force or the use of force claims, what do we do with the Monell Claim? What if we said, we're not going to reach prong one, we're not going to say whether it was a constitutional violation or not because it's not clearly established? What happens to the Monell Claim? Because the district court, it seems to me, thought that the Monell Claim falls away because there was no constitutional violation. What if we say, no, it's just not clearly established? What do we do with the Monell Claim? Sure. Again, as you said, the district court correctly found that there was not a constitutional violation. Without an independent constitutional violation, the Monell Claim cannot survive. But as Your Honor also pointed out, not only was there not a moving force identified behind the alleged constitutional violation, but there wasn't any causation either. That wasn't anything that was appealed or argued, and we would submit that the record does not support that. The appellants wish to characterize and silo this case into the perspective of the single persons of diminished capacity policy of the Nicholasville Police Department, but this case can't be looked at from one single perspective. Not only was that policy something that did not create and confer ministerial duties, as appellants alleged at the 11th hour, after discovery had closed, after the legal theories had been formed, and in response to our motion for summary judgment, it completely shifted the thrust of the case, completely moved the target, and all of a sudden identified one single policy as allegedly creating all of these ministerial duties and alleged breach of those duties by the defendants. Correct. Yes. It's got to be shown that the minister, the framer, doesn't seem to escape without training. A friend on the other side of that question, he said, Correct.  And I would submit that not only did the officers receive all of the training that they were supposed to receive to become peace officers in the state of Kentucky, but they received even more so than that, and the record does show that. And so there has not been a... As far as the training that they received, that they suggest that they didn't get, that is not enough to support or establish that the policy or customer practice created the moving force behind the alleged constitutional violation. The causation is simply not there. Simply because an officer or two testified that there was a piece of training they didn't receive, I think it has to go back to the totality of the circumstances here. The training that they did receive regarding the responding to persons of diminished capacity as well as the SRT trainings that they consistently went to in dealing with exactly what this situation turned into, an armed, barricaded subject. And they received training on that over and over again, and the record supports that. And so I would submit that it's undisputed, and it's not a genuine dispute of material fact here whether there was the adequate training received in order to overcome any kind of Monell claim had it even been properly alleged and supported, which we would submit that it's not. Regarding the state law claims and this... How long had this ordeal gone on before the shooting? There were a number of hours that the suspect was under surveillance, if I understand. How much time was taken before the shooting by the officers? The incident occurred over approximately two hours, from the time that they initially got the call and responded to the time that it was concluded. And during that time, they consistently attempted to get Mr. LeDuc to come out of the residence. They asked him over and over, please come out. They had multiple officers trying to talk to him via... Well, I don't understand. Why didn't they just tear gas the place and blast him out of there with tear gas? Is it possible they just got impatient and tired of waiting for this ordeal to be concluded? I would submit not at all, Your Honor. And in fact, the record supports there's deposition testimony that said, we are here until this resolves. I see that I'm out of time. May I briefly answer your question? The deposition testimony is clear that we were here and we were going to be here as long as it took to resolve this peacefully, to have him come out of the house. And that's why they didn't pump the house full of tear gas. That's why they didn't make a dynamic entry. They were there to protect and contain the threat so that negotiations could be facilitated and to try to get Mr. LeDuc to come out of the residence. It seems like tear gas would have been a better option than shooting him. If he had come out with a gun and come out shooting, there would have been a shooting anyhow. But it seems like they could have tried to get him out with tear gas. While tear gas may have been a tactical consideration, we would submit that that does not affect the fact that there was no constitutional violation or violation of a clearly established law. And again, it goes back to they're trying to balance what do we have to do to do what we need to do to protect the community and make sure that all the entrances and the exits, the windows and doors are covered, but also just talk to him and try to get him to come out without trying to introduce more things that would take the situation in another direction. All right. I think you're out of time. And if there is rebuttal? Thank you, Your Honors. Thank you. Thank you, Your Honor. I'd like to respond and follow up with a couple of statements. One, the recent case I referenced, the citation on that is Williams v. City of Canton, 168 F. 4th, 933, decided March 6, 2026. And this is the individual who was shot while discharging a firearm on New Year's Eve in celebration. I would also note Heeters v. Bowers is the case, the best case I have, Your Honor, but I would note in our primary brief, pages 28 to 29, we collect as many cases as we can that are analogous and in the reply brief, pages 6 and 8 through 10. So I want to make sure that I've fully stated for the record what case law we believe supports our claim. There's a couple of questions I want to address. One, they stated that Desmond would not come out of the house. He was not required to come out of the house. He committed no crime. And the other thing that Your Honor just pointed out is there were certainly less restrictive and less serious options other than shooting him than what the police chose to. There was a statement that he might have been a danger to others. I don't believe the facts support that. The girlfriend was out of the house and the police had evacuated the surrounding homes. So the only individuals that were in danger were Desmond himself and then the police officer. So I don't believe the otherwise danger to the public is a factor that could be considered here. There's a reference to the 95% chance that someone would die, either me or the police. That was one statement by a police officer. But more importantly, Officer Horton is the individual who actually shot Desmond, testified he had not heard that. And so I don't think that can be used to justify his decision to shoot Desmond. There's questions about Captain Marshall. I believe that he stepped behind right as he was calling, but in the seconds prior to Desmond being shot, he did not see Desmond pointing the gun, and that's at his deposition, page 80 through 81. Regarding the Minnell claim, there is a policy of responding to suicidal threats with essentially the SRT team. I cite you to sponsor deposition at page 58. And again, if you respond to somebody who's suicidal with overwhelming show of aggressive force, it should not surprise anybody that that agitates and further makes the situation worse. And also, it ignores the Nicholasville Police Department's own policy, which is essentially de-escalate, not escalate. Everything they did in this case was contrary to their policy. In every situation, they yelled at him, they pointed guns at him, and then they ended up shooting him rather than taking additional time. And in conclusion, Your Honor, Desmond and the Duke called the... The police were called to Desmond and the Duke's house to help prevent a suicide, and they ended up killing him. And that should not be protected under the Constitution. Thank you. Thank you very much. And the case is submitted.